UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BRYAN N. TAYLOR,

    Plaintiff,

v.

PELICAN BAY; et al.,

    Defendants.

No. C 07-639 MHP (pr)

**ORDER GRANTING SUMMARY JUDGMENT FOR DEFENDANTS**

## INTRODUCTION

In this pro se prisoner's civil rights action, Bryan N. Taylor contends that his religious freedom rights were violated by staff at Pelican Bay State Prison. Defendants have moved for summary judgment, and plaintiff has opposed the motion. For the reasons discussed below, the court grants the motion and will enter judgment in defendants' favor.

## BACKGROUND

The following facts are undisputed unless otherwise noted:

The events, acts, and omissions giving rise to Taylor's claims occurred between November 2005 and August 2007 at Pelican Bay State Prison.

At the relevant time, Bryan Taylor was an inmate at Pelican Bay. He was transferred to that prison from another unidentified institution on or about November 1, 2005. He was released from prison on May 4, 2008. For purposes of this motion, Taylor will be considered a member of the Seventh Day Adventist Church who followed a vegetarian diet for religious reasons.[1]

Defendants were employed at Pelican Bay. Defendant Bliesner was the Protestant chaplain at the prison. Defendants Olson, Lyon, Loftin, Stevenson, Gephart, George, Goudelock, Cardoza, Quam, Wadsworth and Gamboa were employed as correctional officers. They worked in the administrative segregation unit or general population units where Taylor was housed, and had duties that included issuing meal trays to Taylor and other inmates. Defendant Horel was the warden.

A. <u>Procedure To Obtain A Religious Diet</u>

The California Department of Corrections and Rehabilitation ("CDCR") had three diets for prisoners: a regular diet, a special religious diet, and a kosher diet. The special religious diet was a vegetarian diet designed for prisoners whose religions prescribed some kind of limited diet.

There was an established procedure for inmates to obtain a religious diet at Pelican Bay: The inmate would apply for a religious diet card by submitting an "inmate request for interview" form with the chaplain of the respective religion justifying his need for a special diet. The chaplain would then verify the inmate's affiliation with the religious group. If the inmate was approved, a religious diet card would be issued for him to receive a religious diet. After receiving the religious diet card, the inmate would show it in the dining hall to obtain the special religious diet. The chaplain also would forward a list of inmates approved to receive the special religious diet to the food services department. The food service manager would send the list to each supervising correctional cook. Each supervising correctional cook then would add the names of inmates served at the facility to a list of diets maintained at each dining room. (Although defendants refer to a "dining room," it appears that it was a food preparation room, and that inmates were served meals in their cells rather than in the dining room.)

Food service at each of the several Pelican Bay facilities was supervised by a supervising correctional cook, and each satellite dining room within each facility was staffed by a correctional officer. Inmate work crews assembled the meal trays at each dining room, and then put the prepared meal trays on hot carts. The number of inmates on the list for the

2

religious diet determined how many vegetarian trays were prepared and put on the hot carts. The hot carts were then delivered to the housing units. The vegetarian diet trays were marked as such on the tray lids, and were placed on top of the regular trays in the hot cart.

The housing officers at each housing unit issued meal trays according to dietary information kept for each inmate. Housing officers did not have discretion to provide an inmate with a meal tray other than the one assigned. If an inmate had a problem or a concern with the food he received, he could ask the housing officer to take the issue up with the kitchen officer. It was within the housing officer's discretion whether to address an inmate's issues with the kitchen officer. Defendant correctional officers' custom and practice was to take an inmate's issue up with the kitchen officer if it appeared that the inmate did not receive the appropriate meal under a valid food chrono.

When the housing unit received a religious diet chrono, a copy was posted in the housing unit office, and the information contained in the chrono was written on a board. Given the frequency with which they delivered food trays in their regularly assigned units, correctional officers usually memorized which inmates received religious diet trays and, if unfamiliar with the unit, the officer would write down the information and bring it during meal tray distribution. If an inmate received a regular diet tray and told the correctional officer that he was a vegetarian for religious reasons, the officer generally would instruct the inmate to submit an inmate request for interview to the chaplain for his religious group and request a special religious diet chrono.

B.   Taylor's Application To Obtain A Religious Diet

Taylor states that he had been approved at another unidentified institution for a religious diet chrono since December 2003. There is no evidence that he presented a copy of that chrono to the chaplain at Pelican Bay, and it is not in the record submitted to this court. For purposes of this motion, the court accepts as true that Taylor had been approved at another institution for a religious diet. Regardless of what Taylor did or said about any approval at another facility, it is undisputed that he was informed of the procedure he had to follow to receive a religious diet at Pelican Bay.

3

Defendants Olson, Lyon, Loftin, Nichols, Stevenson, Gephart, George, Goudelock, Cardoza, Quam, Wadsworth, and Gamboa instructed Taylor on the proper procedure for applying for a special religious diet chrono. On November 14, 2005, the prison litigation coordinator responded to Taylor's request for information about a religious diet by directing him to contact chaplain Bliesner. Amended Complaint, Ex. 283.

On or about November 7, 2005, Taylor submitted an "inmate request for interview" form to chaplain Bliesner in which he stated: "Due to my religious convictions I do not eat meat. As is my 1st Amendment civil right. Please issue me a vegetarian chrono. If you can please come talk to me. Its urgent." Id. at Ex. 41. (A "chrono" is prison parlance for a memorandum, usually one that authorizes or prohibits something for a prisoner or staff.)

Chaplain Smith responded two days later: "Only Chaplain Bliesner is authorized to handle religious diet matters, and he is away from the Institution until December 2. Re-submit then." Id.

On December 3, 2005, Taylor submitted another inmate request form to chaplain Bliesner in which he stated that he had "been waiting for you to place me on the vegetarian list and send me a chrono." Bliesner Decl., Ex. 1. Taylor indicated that various other persons had left messages for Bliesner and that Taylor had "not gotten the actual chrono, in accordance with Deuteronomy 14 v. 8. I don't eat pork or meat." Id.

On December 20, 2005, chaplain Bliesner responded to Taylor's request by sending him a standard memorandum requesting additional information about the dietary habits of his religious group and contact information to help Bliesner verify Taylor's affiliation with the group. The memo explained the standards for authorizing religious diets and then instructed the inmate what he needed to do to get one:

> [You] need to provide us with information about the dietary habits of your Religious Group. You also need to provide the address of your Religious Organization and the name of the Religious Contact Person(s) who can verify your Religion's Dietary Practices. Send me your documentation or credentials. [¶] If we receive verification of your personal association or involvement with a Religious group that teaches obligatory abstinence from meat, as a tenet of their faith, a Religious Dietary Chrono will be initiated. If your group is an established group that teaches abstinence from eating meat and we have them on file, it may not be necessary to notify the group if you can establish your knowledge of their Special Dietary practices.

4

Bliesner Decl., Ex. 2.

On December 29, 2005, Taylor filed an inmate appeal complaining that he had not been given the vegetarian diet to which he was entitled as a Christian. He pledged to go on a hunger strike until he received a vegetarian diet chrono. Bliesner Decl., Ex. 4.

On January 4, 2006, Taylor sent to Bliesner an inmate request form that stated: "I am a Christian and in accordance with Deuteronomy 14 verse 8 of the bible, I do not eat meat. Would you please issue me a vegetarian chrono." Bliesner Decl., Ex. 3.

Taylor's December 29 inmate appeal was denied on January 6, 2006 by chaplain Bliesner, who referred Taylor to the December 20, 2005 memorandum that described the procedure to follow for requesting a religious diet. Bliesner quoted part of the earlier memorandum that explained the steps to take to request a religious diet. Bliesner then wrote:

> In your appeal you state that you are a Christian. I am unaware of any Christian groups that teach that it is obligatory for it's (sic) followers to abstain from eating meat or poultry. If this appeal is a response to the December 20, 2005 memorandum that I sent to you, I could not find in your response any verification that you are eligible to receive a Special Religious Diet. I would like to assist you in this matter but to this date you have not provided me with any documentation or an address or phone number of your Religious Organization and the name of a contact person so I can verify their dietary practices.

Bliesner Decl., Ex. 5.

On January 10, 2006, Taylor informed Bliesner that he was a Seventh Day Adventist. Bliesner Decl., Ex. 6. Bliesner then placed Taylor on the special religious diet list and sent to Taylor a copy of the special religious diet chrono issued for him on January 13, 2006. Bliesner Decl., Ex. 7.

C.      Problems With The Religious Diet Service

After the religious diet chrono was issued for Taylor on January 13, 2006, he made occasional complaints about shortcomings in the meals delivered to him. Taylor has presented evidence that the following problems occurred in the food service for him on the following days:

/ / /

5

| Date: | Complaint: |
|---|---|
| March 9, 2006 | Fish was not on tray, and jello was on tray. |
| March 13-16, 2006 | Fruit and coffee were not on tray. |
| May 1, 2006 | Bread was not on tray. |
| May 8, 2006 | Peanut butter or cheese was not on lunch tray. |
| May 29, 2006 | Coffee was not on tray.[2] |
| June 11, 2006 | No breakfast tray. |
| July 5, 2006 | Cake crumbs rather than intact coffee cake were on tray. |
| July 13, 2006 | Cheese was not on tray. |
| July 28, 2006 | Unidentified item was not on breakfast tray |
| July 30, 2006 | Extra eggs or hash browns were not on tray. |
| Sept. 28, 2006 | Beans were not on tray. |
| Oct. 2, 2006 | Peanut butter or cheese was not on tray. |
| Oct. 5, 2006 | Peanut butter was not on breakfast tray. |
| Oct. 21, 2006 | Beans were not on tray. |
| Nov. 14, 2006 | Mayonnaise packet, pear, and cookie were not on lunch tray. |
| Nov. 14, 2006 | Cheese was not on dinner tray. |
| Nov. 27, 2006 | Regular breakfast tray with meat on it was served. |
| Dec. 9, 2006 | Peanut butter was not on breakfast tray. |
| Feb. -, 2007 | Fish was not on tray one day. |
| May 5, 2007 | Beans were not on tray. |
| May 21, 2007 | Vegetables were not on dinner tray. |
| May 31, 2007 | Beans were not on tray. |
| June 1, 2007 | Peanut butter was not on tray. |

Taylor apparently determined that items were missing by comparing his tray to the printed food service menus. The sample menu he provided stated that items could be substituted for the listed menu items at the institution's discretion. Amended Complaint, Ex. 313.

In many instances, Taylor filed inmate appeals on the day he received a meal tray that was deficient in any respect. See, e.g., id. at Exs. 52, 54, 56, 58, 63, 64, 94. Sometimes, he mentioned the missing items to the correctional officer dispensing the meal tray but, according to him, the officer would not go to the kitchen to obtain the missing item. When Taylor was interviewed for one of his inmate appeals about the vegetarian diet problems, he threatened to file a court action unless compensated with a television and a radio. Id. at Exs. 77, 222.

Taylor also filed inmate appeals on several occasions when his meal trays were served late to him. See, e.g., id. at Exs. 55 ("every time" a particular correctional officer worked, Taylor received his breakfast and lunch late), 95 (health request form stating he was "stressed out" because cheese for lunch tray was brought to him 2 hours after his breakfast); 278 (undated letter complaining that he was not served breakfast until 15 hours after dinner was

6

served); 263 (serving breakfast and dinner up to two hours late was "inhumane treatment").

Taylor also went on short hunger strikes from time to time when he was dissatisfied with the food served to him, believing that his complaints would be heard by someone higher in the chain of command if he went on a hunger strike. See, e.g., id. at Exs. 61 (complaining that he wasn't seen by a doctor despite his 5-day hunger strike in May 2006); 80 (announcing planned hunger strike in November 2005); 86-88 and 92 (hunger strike writings demanding vegetarian food and other things but not mentioning religious basis for his demand for vegetarian diet); 234 (letter to Madrid special master about hunger strike that lasted up to four days before January 4, 2006). Prison officials apparently were skeptical of at least one hunger strike and searched Taylor's cell after he skipped meals for two days; they found at least 100 packages of ramen noodles. Id. at Ex. 144. Taylor vowed that he was "not eating any of the 131 top ramen soups in [his] cell" during his hunger strike. Id. at Ex. 92. Apparently, a prison procedure provided for a medical check when a prisoner skipped meals for three days; Taylor was irritated when he did not receive the prescribed medical checks, although he never indicated any particular need for medical attention.

**VENUE AND JURISDICTION**

Venue is proper in the Northern District of California because the events or omissions giving rise to the claims occurred in Del Norte County, which is located within the Northern District. See 28 U.S.C. §§ 84, 1391(b). This Court has federal question jurisdiction over this action brought under 42 U.S.C. § 1983. See 28 U.S.C. § 1331.

**LEGAL STANDARD FOR SUMMARY JUDGMENT**

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and [that] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477

U.S. 317, 322-23 (1986). A fact is material if it might affect the outcome of the lawsuit under governing law, and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Generally, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (citations omitted). When the moving party bears the burden of proof and persuasion on an issue at trial, it must at summary judgment "show that 'the evidence is so powerful that no reasonable jury would be free to disbelieve it.'" Shakur v. Schriro, 514 F.3d 878, 890 (9th Cir. 2008).

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. See Schroeder v. McDonald, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). Whether the amended complaint should count as evidence under this rule is questionable in light of the language of Taylor's verification, which literally only verified his signature and the date, rather than the contents of the amended complaint. For purposes of this motion, the court will assume without deciding that plaintiff's amended complaint is evidence.

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. See id. at 631.

8

**DISCUSSION**

A.  Religion Claim

The First Amendment guarantees the right to the free exercise of religion. "The free exercise right, however, is necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security." O'Lone v. Shabazz, 482 U.S. 342, 348 (1987). In order to establish a free exercise violation, a prisoner must show a defendant burdened the practice of his religion without any justification reasonably related to legitimate penological interests. See Shakur v. Schriro, 514 F.3d 878, 883-84 (9th Cir. 2008).

The Supreme Court has identified four factors for courts to consider when determining whether a regulation or practice is reasonably related to legitimate penological interests: (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates and on the allocation of prison resources generally"; and (4) the "absence of ready alternatives," or, in other words, whether the rule at issue is an "exaggerated response to prison concerns." Turner v. Safley, 482 U.S. 78, 89-90 (1987). The factors are considered to determine whether the state shows a "reasonable" relation between the policy and legitimate penological objectives, rather than simply a "logical" one. Beard v. Banks, 548 U.S. 521, 533 (2006). While all justifiable inferences must be drawn in the prisoner-plaintiff's favor with respect to matters of disputed fact, in disputed matters of professional judgment the court's inferences must accord deference to the views of prison authorities. See id. at 529-30. Unless a prisoner can point to evidence showing the policy is not reasonably related to legitimate penological objectives, sufficient to allow him to prevail on the merits, he cannot prevail at the summary judgment stage. Id. at 530.

Inmates "have the right to be provided with food sufficient to sustain them in good health that satisfies the dietary laws of their religion." Ward v. Walsh, 1 F.3d 873, 877 (9th

9

1 Cir. 1993) (internal quotation and citation omitted). The refusal to provide a healthy diet
2 conforming to sincere religious beliefs therefore may violate the First Amendment. To
3 analyze an inmate's claim that he has been denied the right to food that satisfies the dietary
4 laws of his religion, the court applies the Turner test mentioned above.

5 For a claim under the Religious Land Use and Institutionalized Persons Act
6 ("RLUIPA"), 42 U.S.C. § 2000cc-1, the plaintiff-prisoner must show that the government has
7 imposed a substantial burden on his religious exercise. A "'substantial burden' on 'religious
8 exercise' must impose a significantly great restriction or onus upon such exercise." San Jose
9 Christian College v. Morgan Hill, 360 F.3d 1024, 1034 (9th Cir. 2004).

10 Taylor complains of two different problems: obtaining permission to get into the
11 religious diet program and the delivery of that religious diet once he made it into the
12 program.

13 Taylor has failed to show a triable issue of fact on his claim that his First Amendment
14 rights were violated by the requirement that he first identify his religion to enable the
15 chaplain to verify the claimed need for a religious diet. It is undisputed that chaplain
16 Bliesner did not deny the request for a religious diet, and instead granted it after Taylor
17 provided the requested information. Thus, cases concerning the denial of a religious diet are
18 of very limited help in considering Taylor's claim. Instead, his claim appears much closer to
19 the claim considered in Resnick v. Adams, 348 F.3d 763 (9th Cir. 2003), in which the dispute
20 was about the procedures an inmate had to follow to obtain a religious diet. The court in
21 Resnick considered the four Turner factors and concluded that requiring an inmate to fill out
22 an application to obtain a special religious diet did not violate the inmate's rights under the
23 First Amendment or RLUIPA. See Resnick, 348 F.3d at 771. That parallels the situation
24 here. Pursuant to the established procedure at Pelican Bay, chaplain Bliesner required Taylor
25 to identify his religion so that Bliesner could check whether the requested diet was part of
26 that religion's requirements. Requiring Taylor to apply and to identify for the chaplain his
27 particular religion before admitting him to the religious diet program passed muster under the
28 Turner factors. First, the prison had a legitimate governmental interest in the orderly

10

administration of the prison's diet program to accommodate the religious dietary needs of many prisoners. See Resnick, 348 F.3d at 769; see also Ward, 1 F.3d at 877. Taylor cannot show that he would not have been provided with a religious diet had he provided the information required by established procedures – indeed, he was given a religious diet chrono once he provided the information required (i.e., by identifying his particular religion as Seventh Day Adventist).  Second, Taylor had many alternative means by which he could practice his Seventh Day Adventist religion, such as prayer, participation in religious observances, and modest behavior that accorded with the religion's belief system. See Ward, 1 F.3d at 877. Third, accommodating an inmate who did not want to apply for a religious diet or provide the required information about his religion would have a significant impact in that it would frustrate the orderly operation of the prison's religious diet program. See Resnick, 348 F.3d at 770. Fourth, "[i]t is difficult to think of any alternatives more 'obvious' and 'easy' than simply requiring each inmate seeking a religious diet to fill out the standard . . . application form." Id.  Requiring Taylor to identify his religion and its dietary habits, as well as providing the name of a contact at the religious organization was, at most, a slight burden on his right to religious freedom. That he had already received a chrono at another institution at which he had been housed previously did not undermine the propriety of chaplain Bliesner confirming Taylor's religious affiliation again at Pelican Bay – especially since there is no evidence that Taylor provided a copy of that old chrono to Bliesner. Cf. McElyea v. Babbitt, 833 F.2d 196, 198 (9th Cir. 1987) (faulting prison official for slipshod investigation and reliance on second-hand information about inmate's past behavior to determine whether he should receive kosher diet at different prison). The undisputed evidence is that once Taylor went beyond identifying himself as a Christian who didn't eat meat and stated that he was a Seventh Day Adventist, it was only a few days before chaplain Bliesner issued a religious diet chrono for him. Bliesner's request that Taylor specify his religion more than simply being "Christian" was not unduly burdensome in light of the evidence that the "Seventh Day Adventist religion is the only Christian group that traditionally followed a vegetarian diet." Bliesner Decl., ¶ 7.

11

Viewing the evidence in the record in the light most favorable to Taylor, no reasonable jury could find in his favor on his claim that having to apply for permission to get into the religious diet program at Pelican Bay violated his religious freedom rights under the First Amendment.

The second issue presented concerns problems with the delivery of that religious diet once Taylor was approved for the religious diet program. Taylor has not shown a triable issue of fact with regard to his claims against defendants who occasionally served him meals that were missing one or more items that should have been on the meal trays, nor with regard to his claim against warden Horel to whom he wrote letters complaining about the problems he experienced. In the relevant time – between his transfer to Pelican Bay on November 1, 2005, and the filing of his amended complaint on August 19, 2007 – Taylor was served approximately 1,950 meals. He has presented evidence that on approximately 25 occasions during that time he received less than a complete meal tray. This means that about once every 78 meals (or 1.3% of the time) something was amiss. These occasional missing items are the sort of "relatively short-term and sporadic" intrusions that do not amount to a substantial burden on the prisoner's First Amendment free exercise rights, see Canell v. Lightner, 143 F.3d 1210, 1215 (9th Cir. 1998), or RLUIPA rights, see generally San Jose Christian College, 360 F.3d at 1034 (9th Cir. 2004). Not only were the incomplete meals occurring very infrequently, no particular defendant served all the deficient meals and none of the defendants did the actual preparation of the meals. it is undisputed that the vegetarian meals were prepared by inmate workers and then loaded on hot trays, from which they were dispensed by some of the defendants. There is no evidence that Taylor's meals were marked as destined for him individually, so that he would receive the next vegetarian meal available from the hot cart when he was served. Taylor presented evidence that he did often alert the food service officers to shortcomings on the meal trays when he discovered them and that he usually did not obtain the missing item. However, it remains the case that the incomplete trays occurred infrequently and that the defendant officers distributed meals that they had not made. Viewing the evidence in the record in the light most favorable to Taylor, no

reasonable jury could find in his favor on his religious freedom claims against defendants for the occasional failure of the meal trays to include all the items that should have been on the religious diet food tray.

In their motion for summary judgment, defendants argue that Taylor's claim about the missing food items really goes to a medical concern rather than a religious concern.  The court understood the gist of the amended complaint to be claim of infringement on religious freedoms, and that is the claim the court ordered served on defendants.   Taylor did not object to that characterization in the order of service and did not argue a medical claim in his opposition to the motion for summary judgment.  That is not surprising, as an Eighth Amendment claim would plainly fail.  The infrequency of the incidents (i.e., mistakes in only about 1.3% of the meals) and the fact that all but one of the incidents concerned a missing item from a meal rather than a completely missing meal would spell doom for any Eighth Amendment claim.   The denial of food service can present a sufficiently serious condition to meet the objective prong of the Eighth Amendment deliberate indifference analysis, but not every missed meal amounts to an objectively serious condition.  See Foster v. Runnels, 554 F.3d 807, 812-13 (9th Cir. 2009).  The Foster court found that the denial of 16 meals over 23 days was "a sufficiently serious deprivation because food is one of life's basic necessities," but that the denial of 2 meals over 9-week period was not sufficiently serious to meet objective prong of Eighth Amendment deliberate indifference.  Id. at 812.  Taylor's brief hunger strikes may have resulted in several missed meals in a row, but those were self-imposed missed meals, and not conditions that could be said to be caused by defendants.  Taylor's situation was nowhere near the almost-daily missed meals that Foster found to be an objectively serious condition necessary for an Eighth Amendment violation.

B.    Qualified Immunity Defense

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The rule of qualified immunity "'provides ample protection to all

13

but the plainly incompetent or those who knowingly violate the law.'" <u>Burns v. Reed</u>, 500 U.S. 478, 495 (1991) (quoting <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986)).

In determining whether the defendants are entitled to qualified immunity, the usual first step is to answer this threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" <u>Saucier v. Katz</u>, 533 U.S. 194, 194 (2001).  If no constitutional right was violated if the facts were as alleged, the inquiry would end and the defendants prevail.  As discussed above, the evidence in the record does not raise a triable issue of fact that there was a violation of Taylor's religious freedom rights.  The inquiry thus ends and defendants prevail on their qualified immunity defense.

## CONCLUSION

Defendants' motion for summary judgment is GRANTED.  (Docket # 43.)  Plaintiff filed a motion for summary judgment in which he made his arguments in opposition to defendants' motion.  Plaintiff's motion for summary judgment is DENIED (Docket # 71) because he is not entitled to judgment in his favor.  The court has, however, considered the arguments therein as an opposition to defendants' motion for summary judgment.

IT IS SO ORDERED.

Dated: July 1, 2010

_____
Marilyn Hall Patel
United States District Judge

**NOTES**

1.     It is somewhat unclear whether Taylor was a member of the Seventh Day Adventist Church, but for purposes of the present motion the court assumes he was. The lack of clarity is due to his own statements, in which he typically identified himself as a Christian and cited a particular passage from the book of Deuteronomy in the Bible, i.e., Deuteronomy 14:8, which states "And the swine, because it divideth the hoof, yet cheweth not the cud, it is unclean unto you: ye shall not eat of their flesh, nor touch their dead carcase."  See, e.g., Bliesner Ex. 1 ("in accordance with Deuteronomy 14v.8 I don't eat pork or meat"); id. at Ex. 3 ("I am a Christian and in accordance with Deuteronomy 14 verse 8 of the bible, I do not eat meat."); id. at Ex. 4, p. 1 ("Because of my religious beliefs I do not eat meat. I am a Christian and in accordance with the word of God himself I do not eat meat, especially pork. Please see Deuteronomy 14 verse 8."); id. at Ex. 4., p. 2 ("I am a Christian which is an established religious group. As a Christian it is my duty to obey the word of God. Deuteronomy chapter 14 verse 8 God clearly says do not eat of the swine Daniel chapter 1 verse 12-17 and Matthew chapter 14 verse 18-20 also support. This a vegetarian diet."); Amended Complaint, p. 1 (was approved for a religious diet "because of his religious beliefs plaintiff shares in common with 7th Day Advantis") (errors in source). Only when pressed did he specify that he was a Seventh Day Adventist. See Bliesner Decl., Ex. 6 ("As a 7th Day Adventus, I do not eat pork or meat in accordance with Deuteronomy 14 v.8 of the Bible.")

2.     Taylor's complaint that he did not receive coffee on occasion is somewhat perplexing in light of his statement that he did not consume coffee. See Amended Complaint, p. 9.